835 P.2d 1268

Robert OSICK, Petitioner-Appellant,

v.

PUBLIC EMPLOYEE RETIREMENT
SYSTEM OF IDAHO,
Respondent.

No. 18836.

Supreme Court of Idaho,
Boise, February 1992 Term.

June 8, 1992.

Goicoechea Law Offices, Chartered,
Boise, for appellant. Lynn M. Luker argued.

Larry EchoHawk, Atty. Gen., Steven F. Scanlin, Deputy Atty. Gen., Boise, for respondent. Steven F. Scanlin argued.

JOHNSON, Justice.

This is a public employee disability retirement benefits case. The issues presented are:

1. Does I.C. § 72–318 prohibit the offset required by I.C. § 59–1320(1), now I.C. § 59–1353(1), against disability retirement benefits under the Public Employee Retirement System (PERSI) of the annual amount of workers' compensation benefits payable because of the same disability?

2. If not, does the offset violate the constitutional right to equal protection of the laws?

We conclude that I.C. § 72–318 does not prohibit the offset and that the offset does not violate the right to equal protection of the laws. In doing so, we hold that the rationale of the opinion in *Deonier v. Public Employee Retirement Bd.*, 114 Idaho 721, 760 P.2d 1137 (1988) is not controlling precedent, because only two members of the Court concurred, with one member concurring in the result only.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

Robert Osick was an employee of the Ada County Highway District (ACHD) from 1959 until he was injured while working for ACHD in June 1986. Osick filed a workers' compensation claim, which resulted in a lump sum award of $24,667.50 (150 weeks at $164.45 per week), plus $500.00 per month in compensation for his injury.

During his employment with ACHD, Osick was a member of PERSI. After being injured on the job, Osick applied to PERSI for disability retirement, which PERSI approved in the amount of $903.60 per month. Pursuant to I.C. § 59–1320(1)(b), PERSI offset against Osick's disability retirement benefits the annual amount payable to Osick as workers' compensation.

Osick petitioned the PERSI board (the board) for a hearing, contending that in light of *Deonier*, Osick was entitled to full payment of his disability retirement benefits and reimbursement of past amounts offset. Following a hearing, the board upheld the offset.

Osick appealed the board's decision to the district court, which affirmed the board. Osick then appealed to this Court.

## II.

### *DEONIER* IS NOT CONTROLLING.

■ Osick asserts that *Deonier* controls our decision in this case. We disagree.

In *Deonier*, the Court considered a somewhat similar case. Two employees of the Boise City Fire Department were injured on the job and negotiated lump sum settlements of their workers' compensation claims. The board granted them disability retirement benefits, but ordered, pursuant to I.C. § 72–1414, that these retirement benefits be offset by the amount of the lump sum workers' compensation benefits the two firemen had received. The firemen appealed the PERSI decision to the Industrial Commission. The Commission affirmed the setoff, but reduced the amount.

The opinion issued by the Court in *Deonier* reversed the Commission's decision. The opinion stated that I.C. § 72–1414 did not allow for any offsetting of workers' compensation benefits from the firemen's disability retirement benefits. The opinion also stated that the offset was an unconstitutional impairment of contract and violated the firemen's right to equal protection of the laws.

The board cross-appealed in *Deonier*, contending that it should attribute the firemen's receipt of permanent partial disability benefits under the workers' compensation statutes to periods of actual wage loss for purposes of offsetting pursuant to I.C. § 72–1414. In disposing of the cross-appeal, the opinion in *Deonier* stated: "In view of our holding that the offset provisions of I.C. § 72–1414 are inoperative as violative of equal protection of the law and contractual rights, the issue on cross-ap-

peal is moot." 114 Idaho at 729, 760 P.2d at 1145.

Justice Huntley authored the opinion in *Deonier.* Justice Bistline concurred. Chief Justice Shepard concurred in the result. Justice Donaldson did not participate in the opinion due to his untimely death. Justice Bakes dissented.

Our concern about the precedential authority of *Deonier* is that because only two members of the Court concurred in both the result and the rationale stated in the opinion, the rationale is not controlling for other cases, including this one.

Our constitution provides: "The Supreme Court shall consist of five justices, a majority of whom shall be necessary to make a quorum or pronounce a decision." Idaho Const., art. 5, § 6. *Roy v. Oregon Short Line R.R.,* 55 Idaho 404, 42 P.2d 476 (1934), *cert. denied,* 296 U.S. 579, 56 S.Ct. 89, 80 L.Ed. 409 (1935), is an interesting example of how an earlier Court struggled with the implications of this provision. There, on rehearing, three members of the Court decided a case based on their construction of the positions on the merits taken by three members of the Court, one of whom did not join in the majority decision. The manner in which this curious case was decided is described by Justice Morgan in his dissent:

> In this case the chief justice is in favor of reducing the judgment from $35,000 to $20,000 with the alternative that it be reversed unless the reduction be agreed to by respondent, and two of the justices are in favor of reducing it to $25,000 with like alternative. One of the justices is in favor of reversing the judgment and remanding the case for a new trial on the sole question of the amount of damages to be awarded, and I am in favor of affirming the judgment for respondent in the sum of $35,000.
>
> The chief justice and the two justices who favor lopping $10,000 off the recovery are agreed that the judgment is reduced to that extent, although but two justices voted for it, and that an option is given respondent to accept it or suffer a reversal.

> While it takes three members of this court to constitute a majority, required by the constitution to pronounce a decision, and but two are agreed that the judgment shall be $25,000, the reasoning of the opinion on rehearing, admirable for its ingenuity, has brought about the remarkable result of $1 + 1 = 3$. In order to produce this mathematical monstrosity my vote to affirm the judgment for $35,000 has been so counted as to reduce it to $25,000, or to reverse it if that result proves to be less distasteful to respondent than the reduction.
>
> All this is, no doubt, entirely clear to the three members of the court who have agreed that this is the result of our disagreement, but it leaves me scratching my bucolic head in uncertainty as to which shell conceals the elusive little ball of justice.

*Id.* at 429, 42 P.2d at 486.

This plaintive postmortem is a fitting prelude to our consideration of plurality opinions. Justice Morgan clearly identified the constitutional necessity for three votes to pronounce a decision of this Court, and the majority implicitly acknowledged this necessity:

> It is the opinion of the Chief Justice, Justice Holden and the writer [Justice Ailshie] that, since one of the justices favors an affirmance of the judgment *in toto* and two favor affirming in the sum of $25,000, it necessarily follows as a matter of law that the judgment should be, and is, affirmed in the sum of $25,000.

*Id.* at 426, 42 P.2d at 485.

In *Roy,* however, the Court did not address the question of the effect of two justices concurring and one concurring in the result. This is the question we must address here.

It is also interesting, and perhaps instructive, that among the books that Chief Justice Shepard cleared out of his office and delivered to the author of this opinion when Chief Justice Shepard stepped down as Chief Justice in May 1989, shortly before his death, is a volume entitled *Manual on Appellate Court Opinions* by B.E. Wit-

kin (California Center for Judicial Education and Research 1977). In discussing the topic "Concurrence in Judgment Without Opinion," this treatise states:

> The cryptic statement, "I concur in the judgment," has bothered many readers.
>
> (a) It produces all the evils of a concurring opinion with none of its values; *i.e.*, it casts doubt on the principles declared in the main opinion without indicating why they are wrong or questionable.
>
> (b) It is equivocal: It could mean that the concurring justice does not agree with the principles; or that [the justice] agrees with the principles or some of them but not with the manner of their statement or the reasoning or authorities set forth in support of them; or that [the justice] neither agrees nor disagrees but wishes to stay aloof and keep [the justice] intellectually free to examine the question anew at some later date (perhaps as the author of an opinion); or that [the justice] objects to something in the opinion—a quotation, reliance on an authority that is anathema to [the justice], humor or satire, or castigation of a litigant or counsel—and withholds [the justice's] signature because the author would not take it out.

*Id.* at 223.

This description of the meaning of a vote to "concur in the result," coming as it does from a treatise that Chief Justice Shepard had in his office may shed some light on what his understanding was of his vote to "concur in the result" in *Deonier*. In any event, it provides some outside view of the significance of a concurrence of this type.

In *Chicago, B. & Q.R. Co. v. United States*, 60 F.Supp. 580 (E.D.Ky.1945), the court dealt with the effect of a report of four members of the nine-member Interstate Commerce Commission, with a fifth member concurring in the result. The court concluded:

> We interpret the statement by the fifth Commissioner that he "concurs in the result" of both reports filed in this case to mean that, while he does not assent to all the comments or observations made therein, he is, nevertheless, sufficiently in accord with the rationale of them to enable him to agree that Western Kentucky's rate to Chicago and intermediate destinations taking the same rates is unreasonable to the extent stated and that an order for the future should be entered accordingly.

*Id.* at 583.

The provisions of art. 5, § 6 of our constitution in the light of these discussions in these outside sources, lead us to conclude that where the third vote necessary to pronounce a decision is by a justice who concurs in the result only, the rationale contained in the opinion is not a decision of the Court and is not controlling in other cases.

In *Deonier*, three members of the Court—Justices Huntley and Bistline together with Chief Justice Shepard—concurred in overturning the offsets of the firemen's workers' compensation benefits against their disability retirement benefits. This was the decision of the Court. The balance of the opinion is interesting, but not controlling in this case.

### III.

### I.C. § 72–318 DOES NOT PROHIBIT THE OFFSET.

Osick asserts that I.C. § 59–1320(1), now I.C. § 59–1353(1), is in conflict with and subject to I.C. § 72–318. We disagree.

I.C. § 59–1320(1) provided:

> The annual amount of initial disability retirement allowance of any member shall equal the excess, if any, of (a) over (b), as follows:
>
> (a) an initial service retirement allowance, based upon the sum of [the member's] accrued credited service and such disabled service as would accrue if [the member] were to remain disabled until [the member] would have been eligible for a service retirement allowance as an active member;
>
> (b) the annual amount payable under the provisions of any [workers'] compensation law because of the same disability.

I.C. § 72–318 provides:

(1) No agreement by an employee to pay any portion of the premiums paid by [the employee's] employer for [workers'] compensation, or to contribute to the cost or other security maintained for or carried for the purpose of securing the payment of [workers'] compensation, or to contribute to a benefit fund or department maintained by the employer, or any contract, rule, regulation or device whatever designed to relieve the employer in whole or in part from any liability created by this law, shall be valid. Any employer who makes a deduction for such purpose from the remuneration of any employee entitled to the benefits of this act shall be guilty of a misdemeanor.

(2) No agreement by an employee to waive [the employee's] rights to compensation under this act shall be valid.

Osick argues that the effect of the offset required by I.C. § 59–1320(1) is to take away Osick's previously earned compensation in the form of disability retirement benefits, because he has received workers' compensation benefits, thereby requiring Osick indirectly to finance his workers' compensation benefits. Osick quotes *Deonier* in support of this proposition:

Requiring a firefighter [or PERSI member] to contribute to the cost of [the firefighter's or PERSI member's] own worker's compensation benefits solely from [the firefighter's or PERSI member's] own contribution to [the firefighter's or PERSI member's] retirement fund violates the mandate of I.C. § 72–318 and undercuts a firefighter's [or PERSI member's] right to rely upon the benefits earned over a lifetime of work.

114 Idaho at 723–24, 760 P.2d at 1139–40.

We do not quarrel with the *Deonier* opinion's characterization of retirement benefits under the Firemen's Retirement Fund as deferred compensation or wages. *Id.* at 723, 760 P.2d at 1139. To the extent the rationale of the opinion in *Deonier* would dictate that offsetting the workers' compensation benefits required by I.C. § 59–1320(1) conflicts with I.C. § 72–318, however, we disagree.

The essence of Osick's argument, and of the *Deonier* opinion, on this point is that the offset is the result of an agreement by the employee: (1) to pay a portion of the employer's premiums for workers' compensation, (2) to contribute to the cost or other security securing the payment of workers' compensation, or (3) to contribute to a fund or department maintained by the employer, or any contract, rule, regulation or device whatever designed to relieve the employer in whole or in part from any liability created by the workers' compensation law.

The fallacy in this argument is that Osick's employer was not relieved of the payment of any workers' compensation premiums, the cost or other security for the payment of workers' compensation, or from any liability created by the workers' compensation law. The relief was from PERSI's obligation to pay disability retirement benefits.

We understand that from Osick's perspective, he received less money each month during the period the offset was in effect, regardless of whether the reduction was in his workers' compensation benefits or his disability retirement benefits. I.C. § 72–318 does not, however, prohibit a reduction of disability retirement benefits. It only prohibits an agreement by an employee to relieve an employer of an obligation that the employer has because of the workers' compensation laws.

In this case, Osick argues that in effect during his employment with ACHD there was an implied agreement by him that he would give up part of his entitlement to disability retirement benefits if he were also entitled to workers' compensation benefits because of the same disability. We do not disagree that there was an implied agreement of this type. The agreement was not, however, one of the agreements prohibited under I.C. § 72–318. There is no indication that because of the agreement Osick paid any portion of ACHD's workers' compensation premiums, contributed to the cost or other security for the payment of workers' compensation, or in any way relieved ACHD from any liability created by the workers' compensation law.

## IV.

## THE OFFSET DID NOT VIOLATE OS-ICK'S RIGHT TO EQUAL PRO-TECTION OF THE LAWS.

■ Osick asserts that I.C. § 59–1320(1), now I.C. § 59–1353(1), violated his right to equal protection of the laws under the fourteenth amendment to the United States Constitution and art. 1, § 2 of the Idaho Constitution. We disagree.

In addressing Osick's equal protection challenge, our first task is to identify the challenged classification. *State v. Missamore*, 119 Idaho 27, 33, 803 P.2d 528, 534 (1990). Osick contends that I.C. § 59–1320(1) makes a distinct classification: (1) between industrially disabled retired employees and all other retired employees, (2) between industrially disabled retirees who receive workers' compensation and all other disabled retirees, and (3) between younger and older industrially disabled employees.

■ Where the classification is suspect because it is based on nationality, race, or religion, or where a fundamental right is involved, we review the classification with strict scrutiny. *Id.; Johnson v. Sunshine Mining Co.*, 106 Idaho 866, 869, 684 P.2d 268, 271 (1984). This case involves neither a suspect classification nor a fundamental right. Clearly, nationality, religion, or race is not the basis of the classifications about which Osick objects. Age is not a suspect classification. *Gregory v. Ashcroft*, — U.S. —, —, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410, 430 (1991). Osick does not claim he has a fundamental right to receive retirement or workers' compensation benefits.

Osick does assert that we should review the classifications under the "means-focus" test. In *Johnson*, the Court described the limited circumstances in which we will apply the "means-focus" test:

The "means-focus" test is applicable only if "the discriminatory character of a challenged statutory classification is apparent on its face and where there is also a patent indication of a lack of relationship between the classification and the

declared purpose of the statute...." *Leliefeld v. Johnson*, 104 Idaho [357] at 373, 659 P.2d [111] at 127 [(1983)].

106 Idaho at 869, 684 P.2d at 271.

Looking at I.C. § 59–1320(1), we see no patent indication of a lack of relationship between the classification and the declared purpose of the statute. The statute merely provides the calculation for determining the annual amount of initial disability retirement allowance. The purpose of PERSI is:

to provide an orderly means whereby public employees in the state of Idaho who become superannuated or otherwise incapacitated as the result of age or disability, may be retired from active service without prejudice and without inflicting a hardship upon the employees retired, and to enable such employees to accumulate pension credits to provide for old-age, disability, death and termination of employment, thus effecting economy and efficiency in the administration of the state, county and local government.

I.C. § 59–1301(2).

In the context of this purpose, I.C. § 59–1320(1) coordinates the disability retirement benefits with any annual workers' compensation benefits to which the disabled employee may be entitled because of the same disability. Whether we agree with the policy decision contained in I.C. § 59–1320(1) or not, there is a relationship between the classification created by the statute and the purpose of PERSI. The classification is related to providing an orderly means of retirement for public employees, economically and efficiently. Thus, the "means-focus" test is not applicable.

■ Because neither the strict scrutiny test nor the "mean-focus" test applies in this case, we determine whether there is a violation of equal protection by applying the rational basis test. *Tarbox v. Idaho Tax Comm'n*, 107 Idaho 957, 959–60, 695 P.2d 342, 344–45 (1984). The rational basis test "requires only that the statute 'advances legitimate legislative goals in a rational fashion.'" *Johnson*, 106 Idaho at

869–70, 684 P.2d at 271–72 (citing *Leliefeld,* 104 Idaho at 374, 659 P.2d at 128).

The legislative goal in requiring the off-set at issue here was obviously the adequate funding and actuarial soundness of PERSI. The statute advances that goal in a rational fashion.

### V.

### CONCLUSION.

We affirm the decision of the PERSI board.

We award costs to PERSI.

McDEVITT, J., and WALTERS and REINHARDT, JJ. Pro Tem., concur.

BISTLINE, Justice, specially concurring.

Generally, there is nothing in Justice Johnson's opinion that gives me any great concern. He correctly observes that there were three votes forming the *Deonier*[1] majority, namely, Chief Justice Shepard and Justices Huntley and Bistline. The opinion was authored by Justice Huntley, and Justice Johnson is correct in the observation that Justice Shepard's vote showed "concurs in the result." The result was a decision of the Court that the off-set provisions of I.C. § 72–1414 *are unconstitutional,* and the cross-appeal was rendered moot. Justice Bakes wrote a substantial dissent wherein he lamented that, "this Court should not lightly reject its own long accepted precedents and the clearly expressed policies of the legislature which have been in place for decades." 114 Idaho at 729, 760 P.2d at 1145.

When I reread the eight plus pages written by Justice Huntley and then twelve pages written by Justice Bakes, I am unable to subscribe to the notion that the Court's opinion did not "lightly" arrive at its decision. Moreover, there was much written by Justice Bakes which was very comprehensive and persuasive. It happened that I concluded that the two injured firemen were entitled to be *fully* compensated. It seemed to me that Justice Hunt-

ley's views would best serve that purpose. So much for that.

Today, only four years later, we ponder over a sequel to *Deonier.* We have before us a proposed opinion which concedes that *Deonier* is "somewhat similar" to the instant *Osick* case. That similarity has given Justice Johnson pause to consider and reflect on the meaning of Justice Shepard's vote, which was to "concur in the result." The conclusion reached by Justice Johnson is "that where the third vote necessary to pronounce a decision is by a justice who concurs in the result only, the rationale contained in the opinion is not a decision of the Court and is not controlling in other cases." At 460, 835 P.2d at 1271. From that statement he concludes that the Court in *Deonier* did not pronounce a decision, predicated upon Justice Shepard's "concurring in the result," which in the view of Justice Johnson *precludes the rationale contained in the opinion from being a decision of the Court, and hence not controlling precedent.*

Turning back to the excerpt of *Roy v. Oregon Short Line R.R. Co.,* which is portrayed in the Court's opinion, I find that the manner by which that *ratio decidendi* is reached, "leaves me scratching my bucolic head in uncertainty" as to what the basic issue is in this case. At 459, 835 P.2d 1270; *Roy,* 55 Idaho at 429, 42 P.2d at 486. I submit that the answer is that the Court must determine what, by definition, is a "decision"?

**Decision.** A determination arrived at after consideration of facts, and, in legal context, law. A popular rather than technical or legal word; a comprehensive term having no fixed, legal meaning. It may be employed as referring to ministerial acts as well as to those that are judicial or of a judicial character.

A determination of a judicial or quasi judicial nature. A judgment, decree, or order pronounced by a court in settlement of a controversy submitted to it and by way of authoritative answer to the questions raised before it. The term is broad enough to cover both final judg-

---

1. *Deonier v. Public Employee Retirement Bd.,* 114 Idaho 721, 760 P.2d 1137 (1988).

464

ments and interlocutory orders. And though sometimes limited to the sense of judgment, the term is at other times understood as meaning simply the first step leading to a judgment; or as an order for judgment. The word may also include various rulings, as well as orders, including agency and commission orders. U.S. v. Thompson, 251 U.S. 407, 40 S.Ct. 289, 291, 64 L.Ed. 333.

The findings of fact and conclusions of law which must be in writing and filed with the clerk. *Wilcox v. Sway*, 69 Cal. App.2d 560, 160 P.2d 154, 156.

'Decision' is not necessarily synonymous with 'opinion.' A decision of the court is its judgment; the opinion is the reasons given for that judgment, or the expression of the views of the judge. But the two words are sometimes used interchangeably.

Black's Law Dictionary 407 (6th ed. 1991).